Good morning, your honors. My name is Haley Fremer, and I'm here on behalf of Richard Renzi. With the court's permission, I'd like to reserve two minutes for my colleague, Mr. Quigg, to speak on behalf of Mr. Salen, and two minutes of my time for pro bono. Very much the clock. Thank you. Your honors, the reason we are here today is that Philip Harries emailed the prosecutor to inquire about his reward just a few weeks before the Supreme Court decided to assert petitions. And Mr. Harries sent the same email to the prosecutor after that decision. The government presumably would have paid him his reward by now, as the agency had planned all along. But the defense never would have known a thing, which is what the government had intended. We never would have known that in November 2006, the FBI coaxed Mr. Harries into continuing to cooperate by getting him out of a family counseling session, by telling him that recording calls was exactly the kind of thing that the FBI rewarded him. We never would have known that the lead AUSA personally reviewed the admonishments just before the trial, forms that the district court found clearly contemplated, payments to witnesses, and decided not to give them to the defense. We never would have known that Mr. Harries believed that he deserved to be paid, and that the agency believed that he deserved to be paid. And we never would have known how misleading and disingenuous the government's not-one-thin-dime closing argument really was. This was a close case, and Harries' credibility was a central issue. Well, okay, on that point, he had a receipt one-thin-dime at the time the prosecutor sent it, right? That's correct, Your Honor. Okay, but let's talk about this particular witness. It appears that the jury knew that Harries had lied about Renzi first mentioning the Salem property, and that Harries had a grudge against Renzi. Why would knowing that Harries might be paid as a cooperator have had any effect on the jury's decision? Well, Your Honor, this goes to the materiality standard. And obviously, materiality is contextual. It depends on the facts of the case. You have to look at it for the strength of the evidence on both sides and the importance of the suppressed evidence. But that gets to sort of an important point here. This Court's cases have given some guideposts as to what evidence, what kind of materiality, one of the things that the Court has repeatedly recognized is impeachment evidence, evidence that would have exposed a new line of impeachment regarding a key government witness is especially likely to be mature. And that's what we have here. I mean, there really isn't any dispute at this point that Harries is credible. You know, he's mentioned 90 times in the closing argument. His free pass testimony is referred to seven times. The government calls it the essence of the offense. And so his testimony and his credibility is certain. And, in fact, the government acknowledges his punch in closing by telling the jury that it needs to figure out his credibility in order to return a verdict. Now, this impeachment evidence, the fact that he might be paid, the fact that he had discussions with the FBI about being paid, the fact that the reward actually motivated him to action, the dangling of the reward caused him to leave this family counseling session and to record this call, opens up a new line of impeachment. Specifically, we did. And we impeached Harries on the grounds that you mentioned. We also knew that he had a contract with the DOJ to serve as an expert witness in an unrelated civil case. But we had no idea, no idea, that Harries believed that he could be paid for cooperating with a criminal case. And that's the evidence that Harries fabricated in his testimony. Well, the evidence shows that Harries' initial statement to the FBI, and this was suppressed evidence, indicated that he learned about the bill, he first became, sorry, he learned about the Salem property, and first became involved in seeking it in his conversations with Tobey Keene, who was Ren's district director in Arizona. After Mr. Harries learns that he could be paid for his testimony, he could be paid for cooperating, he adopts a new version of what happens. This time, he walks into a meeting, having never heard of the Salem property, and Ren's disgrace upon him, out of the blue. And that's the moment that the governor alleges that when his will was overborne, that is the issue of facts, the honest services of facts, that's the issue here. The problem is, we never knew that his initial account was different than his story he told on Trigger Tricks. Well, it's not just that the phone records show that he talked to Salem the day before he met with Ren's team, but what the suppressed evidence showed is that there were additional discussions with Joanne Keene, and in fact, the evidence that we introduced at trial showed that the draft bill that she emailed to legislative counsel before this meeting ever took place already included the Salem property. But so what difference does it make whether Ren's heir Keene, the district director, first mentioned the Salem property? What difference does it make? Because there's all sorts of things that come back later, and there's exchanges that happen, and all of that. So what does it matter? Well, it makes a difference in a couple of grounds. First, as Agent Odom justified in the inventory hearing, the information wasn't important, his words weren't important, because it would have changed one's perceptions of the initial meeting. You know, the governance theory of the case is that Ren's team basically directs the man at this meeting, and no sort of background information is going to require this property, which would be very odd. In fact, what we, our defense theory was that Ares came to the meeting and pitched this property as being important to a land exchange. The suppressed evidence suggests that that's true, and the fact that he was discussing rewards with the FBI gives us two things. A prior inconsistent statement, which we otherwise did not know about, which would suggest that maybe he was fabricating in a financial interest. Which suggests that he had a motive to fabricate. See, those two points together make this a pretty powerful piece of impeachment evidence. We did not know, and we in fact made an affirmative decision not to attack his credibility along the lines of getting paid by the FBI. Based on the gating of disclosures we got from the U.S. government, and we were misled. If we had known that we had a basis to suggest that he believed that he served to be paid, and that he was led instead, believed by statements from the FBI and from the admonishments, that would have been a very powerful line of attack. Particularly, as Bagley teaches us, particularly since the very people who had the ability to decide whether to pay him and how much to pay him, were the agents who wanted to see Renzi depicted. That's really where this comes as important information. It's important impeachment material going towards a key witness. How did all this evidence come out, and when did it come out? Yes. So, Your Honor, after Mr. Renzi's appeal to the 9th Circuit, the second appeal, the merits appeal, Littleberry's emailed the prosecutor to inquire about getting a reward. He had made inquiries before, but they had been concealed by the FBI. This particular inquiry went to the lead A.O.S.A. It was in writing, it was in email, and he notified us, and we filed a new trial motion. The government, in defending the new trial motion, produced for the first time the notes of the agent interviews, which showed us that not only was there a financial issue at play, but there was suppressed evidence that was included to the first meeting with Mr. Harris. And that suppressed evidence, again, goes towards who introduced the bill, which was the key. So you're using suppressed evidence. You're not using it that the court suppressed it. No, Your Honor. You're just saying that you didn't know about it. That's right. I'm saying that the government knew about it, and we didn't know about it. I view that as a little more term of art. Suppressed evidence means that the court suppressed it. It was concealed, it was hidden. You can use a variety of different words. It's information the government had, and we didn't know. And again, on materiality, I'd like to make one further point on this. The reality is, when you look at what happened here, and these court cases say it all the time, it's the best evidence of materiality is the government's own conduct. Right? And so in this case, what do we know? We know that the government took a series of steps, deliberately, to make sure that the defense never knew that it was a discussion of theories about a particular report. How do we know that? Well, we know that Mr. Odo, Agent Odo, in November 2006, induces his continued cooperation. FBI policy requires you to note that in the source file, he omits it. That it's an intentional decision to protect this witness. The AUSA, again, intentionally conceals the admonishments. You put this pattern together, and what you see is the government recognizing that it doesn't want the defense to know that there's any possibility that Ares could be paid. That's the whole point of what they've done. That's the whole point of waiting to pay him until after the appeal is finalized. They know that if there's a retrial, Ares looks terrible if they've already paid him. So they want to hide him, and we never would have known. And to make matters worse, again, look at the government's conduct. What do they do with the clubs? They told the jury that Mr. Ares had not received a thin don, not one thin don. It never happened. On that point, the Supreme Court says it's, if you look at Civic versus Hartman, and Sutter versus Ryan, that we held that under Supreme Court precedent for relief to be granted on a good-paying claim. The testimony had to actually be false. And how can we grant you relief when I asked you about that? You said he hadn't received one thin don, so it's not actually false. And let me address that in sort of two parts. The first part is we are also arguing that the evidence that this misleading closing argument demonstrates that the government understood that this evidence was material. And this booklet goes to our grading claim. It goes to the executive claim. So sitting at coincide for one second, what this showed, right, is that the government was capitalizing on its own disclosures. It knew we were not in a position to say, yeah, but he's been talking with the FBI, and he's getting paid. It knew we couldn't do that. It took advantage of the information that it had hidden. And that is evidence by the government's old conduct. They didn't know it was material. So just for a moment, because I think I'm hitting the end of my time, on the new bill issue, this Court has also held, or at least suggested, that misleading evidence, misleading testimony, misleading argument, can also support an immediate claim. And, in fact, it also suggests that if you look at the DeJoyian opinion, I think it's a judge-consisting opinion, he, in fact, relies on a misleading closing argument, one that's not technically false, but a misleading closing argument to conclude that there was government misconduct that warranted setting aside protection. So with that, I think I'm out of time. And, initially, unless the Court has different questions, why don't you start, Jess, right now? I think the district court, and we'll give you extra time. Thank you. The district court actually agreed with you on the fact that the government, and he used the term suppressed exculpatory evidence, that the district court's decision was based on a lack of materiality. I think when you get, when you have back our rebuttal, I think really focusing on whether this meant that Brady's standard of materiality would be important. I understand, Your Honor. And, again, I would point you to those two last pieces, which say that if it's an important impeachment evidence regarding a key witness, it's especially likely to be material. Secondly, if you look at what the government did, it's very clear that the government did not want the defense to know about these payments and paries, and that it took advantage of it and capitalized it, ultimately, in its rebuttal closing. May I proceed? Proceed. Good morning, and may it please the Court. My name is Charlie Quig. I'm here today on behalf of James Sandlin. We filed a joint brief with Mr. Renzi in this matter, and we join in Mr. Kramer's argument in its entirety. Our position is that the issues in this appeal are identical, as between Mr. Renzi and Mr. Sandlin. But with that said, we set aside two minutes of time, in case the Court has any questions you need to Mr. Sandlin. Otherwise, I'll yield the remainder of my time to Mr. Kramer for rebuttal. All right. Thank you. It's fascinating. I understand that the claims are virtually identical, depending upon each other. Thank you. Thank you. Good morning, Your Honors. Anna Goodman for the United States. I'd like to clarify what the record is here. Counsel referred to E and S, there have been no payments to Mr. Aries. Counsel said that. How do we know? Is that in the record? How do we know the government has a pay, or is the government not still on pay? Just in case we go ahead and push for a new trial. The government has never paid Mr. Aries for his cooperation, and I confirmed that with the United States Attorney's Office on this Monday. The government has also not been in discussions with Mr. Aries about a potential report. The district court found that there were two pieces of payment evidence, and only two that were not disclosed. One was the standard form admonishments that were read to all cooperating witnesses, including Mr. Aries. And the second, the district court credited Mr. Aries' testimony that on one occasion, in November of 2006, Agent Odom told Mr. Aries that making calls was the kind of thing that the government reported. The district court correctly found that that evidence was not material, and that's correct, Your Honors, for three reasons that I'd like to quickly state here. The first is that as this court and the district court found this court in its prior opinion, Mr. Aries was very effectively impeached at trial with evidence, including evidence of payments he had received from the Department of Justice. And in light of that evidence, the district court correctly found that it would not have changed the result if the jury had known that Aries believed there was a possibility of a reward. The money that he got from DOJ was what? That was just what Judge Stammer witnessed before? No, Your Honor. Actually, counsel, very skillfully on cross-examination, brought out that Mr. Aries had received $15,000 in civil cases for serving as an expert and that Mr. Aries had a continuing contract with the United States in which he could be paid a maximum of $26,000. This evidence was all before the jury. And I'd also like to clarify what other evidence was before the jury. The jury knew this was all in this court's prior opinion, and it's in the district court's opinion. The jury knew beyond any doubt that Mr. Aries had heard about the San Juan property from Ms. Payne the day before the meeting. This court, and we agree, did not think that made much difference, but it was before the jury. Counsel, when he cross-examined, showed Mr. Aries the San Juan phone records, and Mr. Aries said, yes, my testimony was not true. That was before the jury. The jury knew the truth about that. I'd like to get to my second reason why this wasn't material, and that's that everyone agrees that Mr. Aries' key testimony, to the extent he has key testimony, is that Mr. Renzi promised him a free pass at their April 15, 2005 meeting. None of the impeachment evidence, the pieces, the individual pieces, and the accumulating, would have anything to impeach him because Mr. Aries has not changed his story about that. He was consistent with that when he first agreed to cooperate in his very first meeting before there was any mention of Payne. And another thing Mr. Aries testified, and the district court apparently credited his testimony at the post-trial hearing, he said without contradiction, I was not motivated to cooperate because of this suggestion, possibility of Payne. In 2006, when I was making these calls, I had five horses, an Escalade, several other vehicles, and a diesel truck, and a giant house. He said that he wanted to cooperate. Did you later go back over to the meeting and discuss financial circumstances when he was making these emails? He was after trial, and probably after his recording the phone calls, he had gone bankrupt, he needed money at that time, but he also made clear that his motivation to cooperate throughout, there was no contradiction of this, was this basically that he thought that Renzi, and he was a victim of this crime, Renzi had ruined his financial prospects, had ruined his career, and another piece of impeachment evidence that came out at trial was that he had told a friend that he wanted to, pardon my language, screw Renzi and Sandlin seven ways to Sunday. As the district court found his motive was this grudge, but certainly none of the impeachment evidence would have nothing that I've heard mentioned or that the district court found would have impeached that key testimony about the three cats, and I think there's one other very important point that it's important for the court to focus on, and that's the broader evidence. The district court identified corroborating evidence, but there's also a broader picture of the evidence that needs to be looked at in context, and this court said in its prior opinion, the primary dispute at trial was not whether Renzi pushed the Sandlin track, but why did he do this? Clearly, he was interested in the property. Was it not a corrupt motive? And the government's principle evidence, and it was very strong evidence, is that a corrupt motive was not dependent at all on Harry's credibility. It was Mr. Headner's testimony. Mr. Headner testified that when Renzi was asked whether he had a business relationship with Mr. Sandlin, he became very aggravated and lied. He said, no, I have no business relationship. He had no reason to do that if his motives were above board, and his team testified that Renzi said after these discussions that he wanted to put the brakes on the land exchange because he was concerned about the corruption charges that had been brought against Congressman Duke and Flemingham, and Mr. Sandlin also lied about this business relationship. He told Harry's in a recorded call, nothing to do with Harry's credibility, and was playing for the jury that Renzi was not involved with the land in any way, shape, or fashion, and that he hadn't received any kind of proceeds from the closing, and those were lies, and there was no reason for those lies. On this primary dispute before the jury, the government had very strong evidence, and it did not rest on Harry's credibility. So you want to ask what was the evidence that was in trial that has nothing to do with Renzi, I mean nothing to do with Harry's? The evidence that was in trial, in addition to the evidence I just cited that's all about... There was financial evidence, excuse me. There was also financial evidence that came, that immediately after Mr. Aries made the deposit or the $1 million payment to Mr. Sandlin, Mr. Sandlin puttled that to Renzi through one of his companies, and Renzi did not report that on his public financial disclosure form, and so it's this cover-up evidence that doesn't really have to do with Harry's credibility that is the evidence on that primary dispute. I'd also like to point the court to the very strong evidence given by Mr. Hegner on what this court said was the key ultimatum, which was that Renzi told him, no Sandlin property, no bill. This was two days or three days before this April 15th meeting at which Mr. Aries and he supposedly scrummed this on Mr. Renzi, and that can't have been the case because Renzi was giving this key ultimatum to Mr. Hegner days before, and Mr. Hegner was so shocked by that testimony that he wrote himself a letter and sealed it up and mailed it to himself, a contemporaneous letter, and so that's the evidence that was before the jury, and the district court correctly found that knowing this in comparison, very weak impeachment evidence, which would have been that Aries believed there was a possibility of reward. He had not been promised anything. He had not been paid anything. So in that point, isn't it possible or indeed possible that the possibility of a reward has more influence than the actual reward because once you've given him the reward, there's no longer a decisive, but if you call out this possibility of a reward, then the incentive exists. Well, Your Honor, I think it's important. That could be true if there was a contingent agreement. In this case, there was no agreement. There was no deal. Standard practice. It seemed to be a form of admonishment that was given. It's a standard practice by the FBI. Yes. It's a standard form that the FBI reads to cooperating human sources, and I'd like to just point out. Cooperating human sources. I did read that. That's an odd term. Well, I think it is. It's supposed to be non-human sources. Yeah. The CHS. The CHS admonishments, Your Honor. It is so odd. But the form, if you look at the form itself, and it's in the excerpts of record, it says admonishments, and that's just what it is. It's full of statements. This is what we can't promise you this. You aren't allowed to do this. It's like warnings to cooperators. We can't promise you're not getting immunity from the FBI. You know, we can't do this. And so it doesn't say anything. It's not a kind of agreement with an individual cooperator. It says nothing about the likelihood of being in a particular case. It is, at most, I mean, imagine the cross-examination resulting from this form as opposed to the cross-examination, which was very lengthy, longer than the plan. Let me ask you this. I think counsel will leave for Mr. Renzi to touch on this, but does the record show as to when someone other than Agent Odom learned that Agent Odom had told Ares that making a phone call to Renzi was the kind of act for which a cooperating witness might be paid? The record shows that no one else learned of that until this close trial proceedings, at which Agent Odom did not remember making that statement. None of the prosecutors, there was no evidence that any prosecutor or anyone else ever heard of this. The district court, Ares specifically remembered it on a specific date when he felt uncomfortable. And so the district court credited Mr. Ares' testimony to that offense, but no one else knew about it. And counsel for Mr. Renzi seemed to indicate that the prosecutors must have known this throughout and were keeping it withheld so that they could gain some sort of advantage in saying the one thin dime. That's not supported by the record. I'm not aware of anything in the record that supports that any prosecutor knew about this one-time statement. And just to be clear, Mr. Ares did not say, oh, I don't want to make any more phone calls, and then Agent Odom pressured him into it. He was pretty reluctant to make that phone call. He was in the middle of a family counseling session, and he was soon to be divorced from his wife, and he suggested that he projected his daughter against his wife. He was very upset. He didn't want to really make that phone call at that point. He did not want that specific phone call. He said exactly what Your Honor said, and then he also said, the agent was feeding me things that Renzi might realize that I didn't know. He was uncomfortable with that particular call. He did not ever tell the agents, I don't want to continue making calls. To the contrary, he said that he wanted to be helpful. He wanted to be helpful throughout. He agreed to make calls before. To the contrary, there was a letter to the prosecutor on September 29th, 2006, before the admonishment was ever read to him, and he continued to make calls. He said it did not affect his decision, absolutely did not affect it. It did not affect his testimony, knowing that there was a possibility of a reward, and that's all there was here. So we submit that the district court was correct in finding that there was no reasonable probability that any of this, the pieces of evidence that the court identified, would have affected the jury's verdict. I'm not going to answer any further questions. Aries was a witness who was important with respect to the free pass testimony. I've explained why none of this would have impeached that. He was not at all the, the district court said he was not the key witness. He was certainly not. There was ample evidence of everything else, and in particular evidence that said what this court said was the primary dispute before the jury. That was very well supported by other evidence. Thank you, Your Honor, sir. I thank you. Thank you. I'd like to mention a few things. I'd like to focus on the materiality wrong. The Supreme Court in the pew said, the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. That's what this case is about. Philip Aries was that witness. Philip Aries was a critical witness, and the jury did not ever have a chance to assess whether this information here mattered. It's not up to the government, it's not the prosecutor's role to tell us what matters. This is up to a jury. We, this court's cases, have stressed over and over again that the importance of full and fair cross-examination of key witnesses means that you have to put this information to a jury so that they can make a determination. If there were to be a new trial, how would the evidence sit down differently? How would your cross-examination of Aries be different? Well, the cross-examination of Aries would be very different because we would demonstrate first that his initial account to the FBI was different than the account that he was trying to sell today. Second, we would demonstrate that he began to, after he agreed to cooperate, learn that he could be paid, and that's when he switched his testimony. And we would have demonstrated that in the interim, between the time he first agrees to cooperate and between the time that he says, I don't want to make this phone call, he receives a non-subject letter, a witness letter, saying he has no criminal exposure anymore. So, yes, of course, when he pleads his criminal exposure, he seems he might be implicated. He agrees to cooperate, many people do. But once he knew that he didn't have that exposure anymore, he said, I don't want to do this. And it's only after he says, I don't want to do this, that Agent O'Neill drops out the, oh, if you can tell it for us, we can, you know, see the thing that we give reports. He skipped to the admonishments. We heard about how these were standard forms. They're non-standard forms. Confidential human resources are incredibly unique witnesses. They're rarely used in cases. And these admonishments made clear, as the district court said, that they contemplate payments. You couple the admonishments with Mr. Bowdoin's statements, theories, and all of a sudden we have a witness who looks like he's basically testifying in hopes of getting money. He said that he wanted, he hoped to get either $10,000 or $25,000. I'm not sure if I can get around all the other damning evidence against him. The other evidence against him relates principally to the fact, as counsel said, it's not whether he encouraged folks to go grab this land. There's a stipulation in the record. Doing that would have been in the public interest, because you would have been able to afford what you got, which was essential to national security. But the financial part is really quite damning to your client. Well, I can understand. Exciting it and not claiming it. I mean, that's not going to suit anyone that does jury work. That is not going to suit following a jury. I understand that. I mean, I understand that there's a bit to explain, and we did try to explain it at the trial. I could go into it in more detail. But the bottom line here is that all that evidence is consistently the fact that this property he wanted, Congressman Reznik wanted this property taken into trust and he wanted it done quickly because the black process was underway and it was personally very hard to make it happen. At the end of the day, I'm a financialist. The truth is Mr. Reznik had paid a debt that he was owed and not a penny more. Mr. Arias paid fair market value for property. Mr. Arias would not have been likely to be able to pay that debt that was owed unless he got recompensed with the Zeland property. Mr. Zeland? First off, yeah, first off, I don't believe there's any – I don't recall evidence in the record on that. The fact is he owned a property that was worth well over $6 million free and clear with no mortgage. At a time when mortgages were easy to get, it would have been very easy for him to repay Mr. Reznik and, in fact, what the record shows is a little bit later on, a few months later, he borrowed $900,000 from a friend, which he has paid off, as the record reflects in sentencing, and he could have easily paid off the entirety of the debt with that money. In other words, Mr. Arias, as far as – excuse me, Mr. Zeland, as far as Mr. Reznik knew, was a wealthy businessman. He had no reason to believe that the money even came from that particular transaction other than the fact that it was close in time. And there's no evidence at anything in the record to the contrary. Was there evidence that he wanted the Zeland property included in the legislation? Absolutely. Was there evidence as to why he wanted the Zeland property included in the legislation? Yes, there is, and it comes in multiple forms. First, both Mr. Eggner and Mr. Arias testified that when they met with Mr. Reznik, he was clear that he wanted the property because of its importance to Fort Huachuca. Both of them. Both. And Ms. Keats testified to that as well. And then second, we have the stipulation. If you recall, or maybe you don't, but it's a long case, there was a SIPA stipulation here. And because we were not – we were precluded from going into the record as to the reasons why Mr. Reznik would have been interested in insuring Fort Huachuca's future. So what we ultimately did, what the Supreme Court required the government to do, was enter into a stipulation, and the stipulation said, again, what Reznik is trying to accomplish would have been in the public interest. He would have retired the largest agricultural water user near Fort Huachuca at a time when the fort was under pressure to reduce its water use and that the fort was essential to national security. I mean, that's what the record is. So when we get into the jury, we're going to believe that. Well, when he would have been acquitted, right? Well, right. And so it comes down to this. You've got a man named Philip Arias, who testifies, saying, I have no financial motive in this case. The government recognizes how important that financial motive testimony is. Don't take my word for it. Look what they did when we crossed the dam and impeached him on the grounds that he received payments, right, from the civil witness contracts. What did the government immediately do? They said, ah, but those do not relate to your criminal cooperation, do they? And Mr. Arias, of course, testified, no, they do not. That argument only works, and let me repeat it again in closing, that argument only works if we don't know the truth, and if the jury doesn't know the truth. If the jury understands the fact that he's open for a $10,000 or $25,000 reward at a time when he's bankrupt, desperately needs money, repeat the emailing the government has requested. That's devastating. That witness is terrible. What we know is that we impeached him. What we know is that our impeachment wasn't good enough. That's all we can take from the fact that this effort by the government to suggest that this is cumulative. All we know is that what we had wasn't good enough. We don't have any idea how good the stuff the government hid from us would have been with this witness. I submit it would have been powerful. I submit it was the most powerful thing we sort of had and didn't. All right. Thank you, Counselor. I don't see if I have any further questions. If not, I'll turn this over to Gary. Yes, ma'am. In the case of U.S. v. Frenzy, it's a group of people in Sweden who are taken drowning v. Spain recently.
judges: Wardlaw, Gould, Callahan